LEXSEE 1990 U.S. DIST. LEXIS 10881

**VARDIS VARDINOYANNIS and THEODORE VARDINOYANNIS, Plaintiffs, v. ENCYCLOPAEDIA BRITANNICA, INC. and WILLIAM J. BOWE, Defendants**

No. 89 Civ. 2475(PNL)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

1990 U.S. Dist. LEXIS 10881

August 20, 1990, Decided
August 20, 1990, Filed

**JUDGES:** [*1] Pierre N. Leval, United States District Judge.

**OPINION BY:** LEVAL

**OPINION**

MEMORANDUM AND ORDER

William J. Bowe, an Illinois domiciliary, one defendant in an action for defamation, moves to dismiss for lack of personal jurisdiction. In the alternative, both defendants move to transfer pursuant to *28 U.S.C. § 1404(a)*. Plaintiffs cross-move to strike Bowe's personal jurisdiction defense.

Background

Plaintiffs Vardis and Theodore Vardinoyannis ("plaintiffs") are Greek businessmen residing in Greece. Defendant Bowe is Vice President, Secretary and General Counsel of defendant Encyclopedia Brittanica ("EB"). Through a Greek license, EB publishes an encylopedia in Greece, containing Greek translations from the English-language version of the Encyclopedia Brittanica. Thirty-four volumes of a 53-volume set are in print. In the summer of 1988, a rival publisher, Etaireia Hellenikon Ekdhoseon ("EHE"), published a 55-volume Greek encyclopedia entitled Hydria. EB's Greek licensee instituted litigation against EHE in the Greek courts, alleging that various articles in Hydria are taken from EB and infringe EB's copyrights. Whether plaintiffs have any connection with EHE is a matter of dispute between [*2] the parties.

In January and February of 1989, Bowe visited Greece on behalf of EB. He learned that plaintiffs, whom he believed to be associated with EHE, were "the principals" of a Greek firm, Audio Visual Enterprises ("AV"), a Greek film distributor. (Theodore Vardinoyannis concedes that he possesses a financial interest in AV. Complaint para. 6.) AV is licensed to distribute videotape products made by Warner Brothers ("Warner"), as well as other motion picture studios which are members of the Motion Picture Association of America (the "MPAA"). [1]

> 1 All references to the MPAA will include its affiliated corporation, the Motion Picture Export Association, which apparently shares the same address in New York City, as well as some officers and staff.

Bowe subsequently arranged to contact the "anti-piracy" units of the MPAA and Warner to call to their attention that plaintiffs, through EHE and the Hydria publication were infringing EB's copyrights. MPAA's anti-piracy unit, "World-Wide Anti-Piracy," is headed by William [*3] Nix and located in New York City. It investigates and attempts to combat illicit copying of video tapes, unauthorized film exhibitions, and satellite transmissions. Warner's anti-piracy unit, also based in New York City, is directed by Molly Kellogg.

On February 22, 1989, Bowe wrote from Chicago to Nix's New York office. In the letter, Bowe complained of

the lack of "effective relief" from the Greek courts and discussed the association of plaintiffs with both AV and EHE and made unflattering, potentially libelous characterizations of the plaintiffs. Pltf. Ex. 8. Finally, Bowe requested the assistance of MPAA, stating, "EB would appreciate it if the [MPAA] and the involved members would independently look into the question of the possible connection of the Vardinoyannis brothers with [AV] . . . . I'm sure your members would want to know for themselves if they are dealing with the perpetrators of one of the most massive and extensive piracies of printed materials in modern times." Pltf. Ex. 8.

On March 1, 1989, from his New York office, Nix distributed copies of Bowe's February 22 letter from his New York office to members of the MPAA, along with a cover letter on his official MPAA [*4] letterhead. The cover letter suggested that individuals contact Bowe directly for more information. Nix Aff. para. 5.

On March 1, 1989, Bowe wrote to Molly Kellogg, the director of Warner's anti-piracy unit, located in New York. He sent Kellogg a copy of his February 22 letter. He then met her in person on March 7 at a meeting in Chicago of the International Anticounterfeiting Coalition ("IAC"). On March 8, 1989, he sent to Kellogg's New York office a letter conveying EB's intention to join the IAC, and enclosing a "fact sheet" about the "Greek Piracy" situation. In the March 8, 1989 letter, Bowe also noted his belief that Theodore Vardinoyannis was the "prime party in interest" of AV, and stated, "The only solution I can see is their promptly removing the pirated HYDRIA set from the market." Bowe requested that Kellogg contact him again once Warner's own internal investigation of the Greek situation (and possible Vardinoyannis involvement) was complete. Deft. Ex. 3. Bowe followed up his letter to Kellogg with several telephone calls to her. On March 13, 1989, Kellogg telecopied the Bowe letter to Ed Byrnes, the executive vice-president of Warner Home Video, a subsidiary of Warner. [*5] Around that time, a copy of Bowe's fact sheet was also sent to Mr. Byrnes. Kellogg Aff. paras. 2-5.

On March 16, 1989, Bowe wrote to Nix again, stating that one of EB's attorneys had checked public records in Greece and found that plaintiffs had no official involvement in EHE. The letter requested that Nix "immediately circulate the report of this lack of involvement on the official public record to the same distributees of your March 1, 1989, letter." Deft. Ex. 4. Nix did so. Nix Aff. para. 6. A "fact sheet" covering the new information was sent to Kellogg on the same day. Kellogg again telecopied that material to Byrnes and discussed it with him.

Sometime in mid-March, plaintiffs communicated a threat of a libel action to EB. Subsequent to that communication, an official at EB telephoned Byrnes in Paris on March 21, 1989, apparently out of concern that Warner might, in Byrnes' words, "take some 'immediate action' based upon [EB's] previous communications." Ex. D to Kellogg Aff.

On April 12, 1989, plaintiffs filed this action against EB and Bowe alleging defamation. Their claims are based on the unflattering statements in Bowe's letter. The complaint alleges that "at Bowe's urging," [*6] the Motion Picture Association of America ("MPAA"), which has offices in New York City, broadcast the contents of the Bowe letter. Complaint para. 9.

Defendant EB counterclaimed alleging violation through EHE and Hydria of Greek copyright law, asserting that plaintiffs have a financial interest in EHE and a management role in its affairs. First Counterclaim paras. 12-13.

Bowe moves to dismiss the complaint for lack of personal jurisdiction. In the alternative, both defendants move to transfer the case pursuant to *28 U.S.C. § 1404(a)*.

Discussion

I. Personal Jurisdiction

Plaintiffs bear the ultimate burden of proving jurisdiction by a preponderance of the evidence. *Beacon Enterprises v. Menzies, 715 F.2d 757, 762 (2d Cir. 1983)*. In order to survive a motion to dismiss, plaintiffs need only make a prima facie showing that jurisdiction exists. When doubts exist, they are to be resolved in plaintiff's favor. *Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194 (2d Cir. 1990)*; *Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55 (2d Cir. 1985)*. See also *CutCo Industries v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986)*.

A federal court sitting in diversity must [*7] apply the law of the state in which the court sits. *Arrowsmith v.*

*United Press International, 320 F.2d 219, 223 (2d Cir. 1963)* (en banc). Bowe argues that New York law does not permit this court to exercise personal jurisdiction over him. N.Y. Civ. Prac. L. & R. ("CPLR") *§ 302(a)* authorizes the exercise of long-arm jurisdiction when the cause of action arises out of acts of the defendant of specified types within the state. *CPLR § 302(a)* provides in relevant part:

*(a) Acts which are the basis of jurisdiction.* As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nondomiciliary, or his executor or administrator, who in person or through an agent:

1. transacts any business within the state; or

2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he

(i) regularly does or solicits business, or engages in any other persistent course of conduct, [*8] or derives substantial revenue from goods used or consumed or services rendered, in the state, or

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce . . . .

Plaintiffs seek to demonstrate that long-arm jurisdiction in this defamation case may be exercised under *Section 302(a)(1)*, the "business transaction" section. *Section 302(a)(1)* is held by the New York courts to include tortious acts within the scope of the "transact[ion of] any business," notwithstanding that the following clauses, *§§ 302(a)(2) and (a)(3)* are expressly directed to the commission of tortious acts as a basis of long-arm jurisdiction. *Longines-Wittenauer Watch v. Barnes & Reinecke, 15 N.Y.2d 443, 261 N.Y.S.2d 8,* cert. denied, *382 U.S. 905 (1965). Legros v. Irving, 38 A.D.2d 53, 327 N.Y.S.2d 371 (1st Dept. 1971)* (defamation). 2 See also *Talbot v. MacLaren, 71 N.Y.2d 827, 527 N.Y.S.2d 729 (1988)*. Despite considerable doubt, 3 I will assume also for purposes of this opinion, because New York courts have relied on *§ 302(a)(1)* as a basis of jurisdiction in defamation cases, that it does apply [*9] to defamation.

2    In *Legros*, an art dealer sued defendant, a domiciliary of Spain, for defamatory statements appearing in defendant's book. The court found that "all the work attendant upon publication of the book" occurred in New York, including research, negotiations with the publishing company, and printing. The court then found that the cause of action arose out of the transactions of business, and found jurisdiction under 302(a)(1).

3    Because *§§ 302(a)(2) and (3)* expressly exclude actions for defamation, there are strong arguments that the legislature intended to bar use of the long-arm statute in defamation cases. *Sections 302(a)(2) and 302(a)(3)*, the sections of the long-arm statute devoted to tort actions, explicitly exempt acts of defamation. The purpose of those exceptions in *§§ 302(a)(2) and (3)* was to "avoid unnecessary inhibitions on freedom of speech or the press. These important civil liberties were believed to be entitled to special protections lest procedural burdens shackle them." 1 Wright-Korn-Miller para. 302.15 (1989). The statute was drafted to avoid, inter alia, situations in which national publications based in distant states are haled into New York courts on a libel or defamation claim simply because the publication (and accordingly the defamatory statement) is available on a New York newsstand. Furthermore, by its plain language, *§ 302(a)(2)*, which extends long-arm jurisdiction over a nondomiciliary who commits a tort within New York, would not cover a nondomiciliary who enters the state for the sole purpose of making a defamatory statement.

The extension of *§ 302(a)(1)* to defamation actions appears to nullify the protection of nondomiciliaries embodied in the enactment of *§ 302(a)(2) and (a)(3)*. The extension apparently permits the exercise of long-arm jurisdiction in a libel or defamation action over a newspaper published elsewhere, if the newspaper were simply to negotiate distribution agreements with New York newsstands. Under *§ 302(a)(1)*, nondomiciliaries who are not "doing business" within the forum under *CPLR § 301* may be subject to long-arm jurisdiction in defamation and libel actions when they have engaged in only

minimal business-related contacts with New York. This is just the sort of litigation which was to be avoided by the exemption of defamation actions from § 302(a)(2) and § 302(a)(3).

[*10] In order to show jurisdiction under § 302(a)(1), a plaintiff must demonstrate first, that the defendant engaged in purposeful activities within the state and second, that a substantial relationship exists between those activities and the transaction out of which the cause of action arose. Proof of one "purposeful" transaction, substantially related to the cause of action, may be sufficient to meet the "transacting business" requirement. *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 527 N.Y.S.2d 195, 198 (1988) (section 302(a)(1) is a "single act" statute). In other words, jurisdiction is appropriate where a defendant, through purposeful activity, has projected himself into local commerce. See also *Fiedler v. First City National Bank of Houston*, 807 F.2d 315 (2d Cir. 1986).

A single communication by telephone or letter with New York in connection with business or a transaction taking place elsewhere, however, is generally not sufficient to confer jurisdiction. In that situation, the individual's acts within the forum are not so purposeful or so designed to avail the individual of the forum's [*11] protections as to justify the exercise of jurisdiction. E.g., *Fiedler v. First City National Bank of Houston*, 807 F.2d 315 (2d Cir. 1986) (bank's phone call to New York to reach guarantor of Texas loan issued for Texas development project did not confer jurisdiction over bank); *Beacon Enterprises, Inc., v. Menzies*, 715 F.2d 757 (2d Cir. 1983) (cease-and-desist letter from California maker of mail-order saunette suits to New York maker of trademark-infringing saunette suit, without more, not sufficient basis for jurisdiction). In the case of sale of goods, mere shipment into a jurisdiction, without active solicitation or consultation concerning the sale of the goods in New York, does not satisfy the "purposeful activity" requirement. See *McGowan v. Smith*, 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 645 (1981).

A nondomiciliary may "act purposefully" within a state for jurisdiction purposes through an agent who is physically within the state. The agent's acts are attributed to the nondomiciliary. An individual physically within the state may be an agent of a nondomiciliary when the domiciliary "engage[s] in purposeful activities in this State in relation to [the nondomiciliary's] [*12] transaction for the benefit of and with the knowledge of" the nondomiciliary, and those purposeful activities are controlled at least in part by the nondomiciliary. *Kreutter*, 527 N.Y.S.2d at 199. See also *Parke-Bernet Galleries v. Franklyn*, 308 N.Y.S.2d 337, 26 N.Y.2d 13 (1970) (Parke Bernet employee who transmits defendant's bids in auction is agent of defendant for jurisdiction purposes). I will assume also that § 302(a)(1) permits jurisdiction to be exercised in a defamation action over a nondomiciliary, where the nondomiciliary engaged in business transactions in New York.

I find nonetheless that plaintiff has failed to make a prima facie showing of jurisdiction over William Bowe. [4] Plaintiff argues first that Bowe's letters and phone calls to New York alone are a transaction of business which satisfies the requirements of § 302(a)(1). I disagree. Bowe's communications did not constitute "transacting business" in New York. While the contacts were business-related, they were not sufficiently purposeful or designed to avail him (or EB) of the forum's protections, to justify the exercise of jurisdiction. Instead, his communications were connected with transactions taking [*13] place almost completely in Greece. His concern was not with transacting business in New York, but with informing New York business acquaintances of events in Greece in the hopes of affecting EB's ability to do business in Greece. See *Fiedler v. First City National Bank of Houston*, 807 F.2d 315 (2d Cir. 1986); *Beacon Enterprises, Inc., v. Menzies*, 715 F.2d 757 (2d Cir. 1983).

    4  Bowe is also apparently an officer of a New York corporation, a wholly-owned subsidiary of EB. Over the past three years, Bowe has sent more than 190 pages of correspondence to New York in connection with the EB subsidiary.

    Plaintiffs do not allege that Bowe's activities as an officer of a separate subsidiary of EB in New York bring him within the reach of the long-arm statute. In any event, that activity is probably not a basis for jurisdiction under 302(a)(1), since it is not substantially related to his dealings with the MPAA and Warner over the Greek matter and the Vardinoyannis brothers. C.f. *Talbot v. MacLaren*, 71 N.Y.2d 827, 527 N.Y.S.2d 729 (1988) (attendance at a New York university not basis for jurisdiction in defamation action for two letters written to university trustees two years

later).

[*14] Second, plaintiffs argue that Bowe's dealings with Nix and Kellogg "caused both the MPAA and Warner to launch investigations of plaintiffs through their New York anti-piracy teams." Brief at 9. Plaintiffs contend that in conducting the investigations, Nix and Kellogg "transacted business" in New York as Bowe's agents, and that their dissemination of statements was transaction of business that must be imputed to Bowe.

Plaintiffs' argument is without merit. First, plaintiffs have not shown that any anti-piracy investigations or dissemination of information was undertaken at Bowe's direction or with his knowledge. Even if Bowe knew of actions taken by Nix and Kellogg, he had no control over them. Bowe certainly hoped that Nix and Kellogg would disseminate the information he had sent them and that their organizations would act on it. Bowe even encouraged Nix and Kellogg to act. But there is no evidence that actions taken by Nix and Kellogg were in any way under the control of Bowe. [5] Bowe had no control over whether and in what form Nix and Kellogg would distribute the information he sent, to whom they might distribute it, or what further action they might take. [6]

  5   In a deposition of William Bowe on June 28, 1989, Bowe stated that it was EB's "expectation and hope that [the Greek situation] would be looked into" by MPAA.

[*15]

  6   The fact that an EB representative called Ed Byrnes of Warner Home Video in Paris -- far distant from Molly Kellogg in New York -- to inquire about Warner's actions concerning the information about the Vardinoyannises and to request that Warner Home Video not disseminate any more information, indicates that neither Bowe nor EB had much control over what Warner or the MPAA was doing with the information.

Merely sending information to an individual physically within a jurisdiction will not, without more, make the nondomiciliary letter-writer subject to jurisdiction. The letter-writer cannot be responsible for every possible use of the information in the letter within the state. Here, Bowe did not have sufficient control over the actions of either Nix or Kellogg to make them his agents for jurisdiction purposes.

Plaintiffs' reliance on Bowe's later requests to Nix and Kellogg to correct any information is misplaced. Those contacts occurred only after Bowe realized that his earlier letters might have been in error, and that he was risking a libel suit. Bowe did not attempt to transact business [*16] in the forum, either directly or through Nix and Kellogg as agents. If anything, the communications represent an attempt to undo the effect of previous business-related communications.

Plaintiffs have failed to make a prima facie showing of jurisdiction over Bowe. I find that Bowe is not required to submit to this court's jurisdiction.

II. Motion to Transfer

In the alternative, defendants move to transfer the entire action to the Northern District of Illinois under *28 U.S.C. § 1404(a)*. That section states in relevant part:

*(a)* For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

The purpose of such a transfer is to prevent the "waste 'of time, energy and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense.'" *Van Dusen v. Barrack, 376 U.S. 612, 616, 84 S. Ct. 805, 809 (1964)* (quoting *Continental Grain Co. v. The F.B.L.-585, 364 U.S. 19, 27, 80 S. Ct. 1470, 1475 (1960))*. Defendants have the burden to show under this statute that litigating in New York is clearly inconvenient [*17] before plaintiff's choice of forum will be disturbed. *Texas Eastern Transmission v. Marine Office, 579 F.2d 561, 567 (10th Cir. 1978)*; see also *Heller Financial, Inc. v. Midwhey Powder Co., Inc., 883 F.2d 1286 (7th Cir. 1989)* (movant has burden of showing that the "transferee forum is clearly more convenient"). In deciding whether to transfer venue, this court must consider the convenience of parties and witnesses, the public interest involved, and any special circumstances. The court may also consider whether actions will be proceeding in the transferee district. In such a case, transfer may serve the goal of convenience by minimizing duplicative litigation and waste of judicial resources. C.f. *Cianbro Corp. v. Curran-LaVoie, Inc., 814 F.2d 7, 11 (1st Cir. 1987)*. In addition, litigation of an entire case in one proceeding may eliminate the possibility of inconsistent results. See

*Wyndham Associaites v. Bintliff,* 398 F.2d 614 (2d Cir.), cert. denied, *393 U.S. 977, 89 S. Ct. 444 (1968).*

Here, defendants argue that the Northern District of Illinois is clearly more convenient for a number of reasons. First, Illinois is the only forum which has jurisdiction over [*18] both defendants. Defendants argue that transferring this action to Illinois would serve the public interest of minimizing expense and the waste of judicial resources. Permitting parallel actions to proceed in both forums might require each issue to be tried twice and would cause unnecessary expenditure of time and money for parties, witnesses, and the judiciary. 7 Second, defendants argue that they would find litigating in Illinois more convenient. Defendant Bowe is an Illinois resident, and EB's principal place of business is Illinois. Both have strong reasons of convenience to litigate in Illinois.

> 7 Plaintiffs respond that they will not duplicate existing discovery in conducting an Illinois action. Instead, they intend to stipulate that the discovery conducted against EB in a New York action will be usable against Bowe in Chicago. Plaintiffs do not deny, however, that parallel proceedings in two different courts will duplicate trial if not discovery, will waste judicial resources, and will pose a risk of inconsistent results.

[*19] On the other hand, plaintiffs argue that New York is a more convenient forum for witnesses. One important witness, Nix, resides in New York. 8 Defendants respond that while one witness may find New York more convenient, the case will require the calling of witnesses who reside all over the world, who will find Illinois and New York equally inconvenient.

> 8 Plaintiffs assert that Kellogg also resides in New York. Defendants respond that she now lives in California.

In view of the fact that the Northern District of Illinois is the only forum which would have jurisdiction over both defendants, and the fact that defendants are both Illinois residents, I find that defendants have carried their burden of demonstrating that Illinois is a more convenient forum then New York. The action is accordingly transferred to the Northern District of Illinois under *28 U.S.C. § 1404(a)*.

Conclusion

The action is hereby transferred to the District Court for the Northern District of Illinois. The Clerk shall transmit the file.

Dated: New York, N.Y.

August 20, 1990

[*20] SO ORDERED.